Christopher B. Turcotte, Esq. (CT 0867)
575 Madison Avenue, Suite 1006
New York, New York  10022
(212) 937-8499

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| CHRISTOPHER B. TURCOTTE and SUSAN TURCOTTE, | : |
| | : Case No. 07 Civ. 4023 (KMK) |
| Plaintiffs, | : |
| vs. | : **VERIFIED** |
| | : **AMENDED COMPLAINT** |
| BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC., | : |
| Defendant. | : **(Jury Trial Demanded)** |
| | : |

_____

Plaintiffs Christopher B. Turcotte and Susan Turcotte (hereinafter "Plaintiffs") bring this Complaint against Defendant Blue Cross and Blue Shield of Massachusetts, Inc. (hereinafter "Defendant" or "Blue Cross"), alleging as follows:

**JURISDICTION AND VENUE**

1.      This action arises under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 et seq. ("ERISA"), and this Court has jurisdiction pursuant to 28 U.S.C. §1331 and 29 U.S.C. §1332, and under principles of pendent jurisdiction.

2.      Venue is proper in this court pursuant to 29 U.S.C. §1332(e)(2) and 28 U.S.C. §1391(b)(2), insofar as plaintiffs are and at all times relevant to this action were residents of New York County and received the medical treatment which is the subject matter of this action in New York County.

**PARTIES**

3. At all relevant times mentioned, plaintiff Christopher B. Turcotte was and remains an individual residing in the State of New York.

4. At all relevant times mentioned, plaintiff Susan Turcotte was and remains an individual residing in the State of New York.

5. At all relevant times mentioned, defendant Blue Cross is, upon information and belief, a Massachusetts corporation that transacts business in the State of New York, with its principal place of business at Landmark Center, 401 Park Drive, Boston, Massachusetts 02215.

**GENERAL ALLEGATIONS**

6. Plaintiff Christopher B. Turcotte is a "participant" of a healthcare plan issued by Blue Cross, within the meaning of 29 U.S.C. §1002(7). His spouse, Susan Turcotte, is a "beneficiary" of a healthcare plan issued by Blue Cross, within the meaning of 29 U.S.C. §1002(8).

7. In or about early 2006, following unsuccessful attempts to conceive a child for more than a year, including attempts vis-à-vis *in vitro* fertilization and artificial insemination, plaintiffs enrolled in a nationally recognized egg donor program at the Center for Women's Reproductive Care ("CWRC") at Columbia University in New York City.

8. In or about October 2006, the CWRC advised plaintiffs that it had a potential egg donor for their consideration. At or about this time, on at least two separate occasions, Ms. Turcotte telephoned Blue Cross to confirm that the insurance carrier provided coverage for donor egg *in vitro* fertilization. Blue Cross confirmed, without qualification, that it provided such coverage.

9. On or about November 1, 2006, an employee at CWRC contacted Blue Cross to verify that plaintiff Susan Turcotte had coverage for a donor cycle in connection with costs associated with the *recipient* portion of the cycle. CWRC staff was advised by Blue Cross that Ms. Turcotte did have coverage for the recipient portion of the donor cycle.

10. Under the section of Blue Cross' "Preferred Subscriber Certificate" (hereinafter "the Agreement") titled "Infertility Services", the insurance carrier contracted under its PPO program to provide benefits

> based on the *allowed charge* for services to diagnose and treat infertility for a healthy *member* who is unable to conceive or produce conception during a period of one year. These benefits include: artificial insemination; sperm, egg and/or inseminated egg procurement and processing; banking of sperm or inseminated eggs (provided these charges are not covered by the donor's health plan); and infertility technologies (such as in vitro fertilization, gamete intrafallopian transfer, zygote intrafallopian transfer, natural oocyte retrieval intravaginal fertilization, intracytoplasmic sperm injection and assisted embryo hatching). . . .

11. The Defendants' "Schedule of Benefits" set forth in the Agreement provides that, relative to "Infertility Services", the insured's cost for "in-network" *outpatient* medical care services or surgical services is a $15 copayment per office visit, while there was no charge for inpatient services for inpatient services or outpatient lab tests and x-rays or for surgical day care unit, ambulatory surgical facility or hospital services. The "Schedule of Benefits" further provides that the insured's cost for "Infertility Services" for "out-of-network" services is a 20% coinsurance after the deductible.

12. While reserving their rights to seek additional coinsurance for the donor cycle, based on Blue Cross' representations to CWRC that, at a minimum, Ms. Turcotte had coverage for the recipient portion of the donor cycle, in or about November 2006, plaintiffs committed to CWRC's egg donor program and accepted one of its anonymous donors, receiving an itemized invoice detailing the medical procedures, CPT codes and corresponding fees concerning the

- 3 -

donor program. *See* Invoice attached hereto as Exhibit "A". As a result, in December 2006, the anonymous donor underwent a battery of pre-screening tests and lab work and both Ms. Turcotte and the donor began taking prescribed fertility drugs to synchronize their menstrual and ovulation cycles.

13.     Following the defendants' approval of the recipient portion of the donor cycle and while Ms. Turcotte and the donor were undergoing testing and fertility treatments, Ms. Turcotte requested that CWRC inquire as to whether any share of the *donor* portion of the cycle was covered under Blue Cross' PPO program. CWRC advised Ms. Turcotte that her medical records would have to be submitted to the defendant for consideration of coverage of the *donor* portion of the cycle.

14.     In a facsimile dated December 20, 2006 transmitted to CWRC, Blue Cross advised that "Susan Turcotte is denied **all infertility services** by our physician review team. The reason is she has an elevated fsh which does not appear to be premature. A letter will follow." (emphasis added)

15.     On or about December 20, 2006, subsequent to CWRC submitting Ms. Turcotte's medical records to the defendant, CWRC was advised that Blue Cross was rescinding its original approval for the recipient portion of the cycle and, in fact, denying coverage for the *recipient and donor portion* of the procedure. CWRC staff advised Ms. Turcotte that it had never experienced such a turnabout from an insurance carrier relative to this fertility procedure.

16.     In a letter addressed to Ms. Turcotte also dated December 20, 2006, the defendant cited as its basis for denying coverage plaintiff's "1.5 years of 'unexplained' infertility", that "donor egg is covered only for absent ovaries, premature ovarian failure . . . or for inadequate

harvest that is not age related" and the fact that "[d]onor egg is not covered to overcome the effects of natural aging."

17. In response, by letter dated January 8, 2007, plaintiffs challenged Blue Cross' findings that Ms. Turcotte's infertility was "age related", submitting letters from Ms. Turcotte's treating physicians stating that she had conceived and miscarried a child in the spring of 2005, at approximately 40.5 years of age, and that, according to one of her treating physicians at CWRC, and contradictory to the defendants' bald conclusion, her infertility *was the result of* "premature poor ovarian response".

18. In reply, by letter dated January 23, 2007, Blue Cross advised plaintiffs that an unidentified, "non-Blue Cross Blue Shield" physician had reviewed Ms. Turcotte's medical records and, despite the findings of Ms. Turcotte's treating physicians, affirmed that her infertility was based on her "advanced maternal age", asserting, without any medical support, that "Poor Ovarian Response . . . and even Ovarian Failure are not considered premature after age 40" and concluding that plaintiffs' donor egg cycle was not covered under the Blue Cross policy.

19. Blue Cross' January 23rd letter barely acknowledged the fact that CWRC had confirmed receiving approval for the recipient portion of Ms. Turcotte's donor cycle prior to plaintiffs' acceptance and initiation of the donor cycle, merely denying that defendant possessed any record of such approval.

20. In reply, under cover letter dated February 12, 2007, plaintiffs provided a letter from CRWC dated February 6, 2007, which stated in pertinent part:

> On or about 11/01/06 an employee of the Center to Women's Reproductive Care at Columbia University contacted Blue Cross of Massachusetts . . . to verify that patient Susan Turcotte had coverage for a Donor Cycle specifically only for the recipient portion of the cycle. ***CWRC staff were advised by Blue Cross of***

> *Massachusetts that Susan did have coverage for the recipient portion of the donor cycle.*
>
> *When CWRC staff advised patient Susan Turcotte that Blue Cross of Massachusetts verified benefits* only for the recipient portion of the Donor cycle, specifically excluding the Donor portion, patient requested CWRC staff to re-verify coverage regarding the Donor portion of the cycle.
>
> CWRC advised patient Susan Turcotte that it would be necessary to provide her medical records to the insurance company to request a formal preauthorization on the complete cycle including the Donor portion. Subsequent to submitting the medical records of the patient to Blue Cross of Massachusetts, *CWRC was advised that the patient in fact had no coverage for the donor cycle including the recipient and donor cycle including the recipient and donor portion*. . . .

See Letter dated February 6, 2007, attached hereto as Exhibit "B".

21. Notwithstanding CWRC's records and its confirmation of approval from Blue Cross for the recipient portion of the donor cycle, in a letter dated March 14, 2007, Blue Cross advised plaintiffs that "according to our records there is no authorization for which Susan was given approval for donor recipient infertility services" and "there is no new information given that would overturn the previous denial."

### FIRST CAUSE OF ACTION

### (28 U.S.C. §2201 -- Declaratory Judgment)

22. Plaintiffs restate and incorporate paragraphs 1 through 21 above as if fully set forth herein.

23. Under the section of Blue Cross' "Preferred Subscriber Certificate" titled "Infertility Services", the insurance carrier contracted under its PPO program to provide benefits

> based on the *allowed charge* for services to diagnose and treat infertility for a healthy *member* who is unable to conceive or produce conception during a period of one year. These benefits include: artificial insemination; sperm, egg and/or inseminated egg procurement and processing; banking of sperm or inseminated eggs (provided these charges are not covered by the donor's health plan); and infertility technologies (such as in vitro fertilization, gamete intrafallopian transfer, zygote intrafallopian transfer, natural oocyte retrieval

intravaginal fertilization, intracytoplasmic sperm injection and assisted embryo hatching). . . .

24.     The Defendants' "Schedule of Benefits" provides that, relative to "Infertility Services", the insured's cost for "in-network" *outpatient* medical care services or surgical services is a $15 copayment per office visit, while there was no charge for inpatient services for inpatient services or outpatient lab tests and x-rays or for surgical day care unit, ambulatory surgical facility or hospital services.  The "Schedule of Benefits" further provides that the insured's cost for "Infertility Services" for "out-of-network" services is a 20% coinsurance after the deductible.

25.     Notwithstanding the foregoing contract terms, Blue Cross is denying coverage for all infertility services to plaintiff Susan Turcotte.

26.     Accordingly, plaintiffs seek a judgment declaring that plaintiffs are entitled to insurance coverage for infertility services under the terms and conditions of the Agreement.

## SECOND CAUSE OF ACTION

### (29 U.S.C. §1132 – Civil Enforcement Based on Denial of Benefits)

27.     Plaintiffs restate and incorporate paragraphs 1 through 26 above as if fully set forth herein.

28.     Plaintiffs and defendant entered into an agreement, whereby Blue Cross agreed to provide coverage for infertility services, including but not limited to egg and/or inseminated egg procurement and processing and in vitro fertilization, pursuant to the terms and conditions of the Agreement.

29.     In or about October 2006, plaintiffs' health care provider, CWRC, sought verification of coverage for Ms. Turcotte from the defendant for its egg donor program.

30.     On or about November 1, 2006, CWRC staff was advised by Blue Cross of Massachusetts that Ms. Turcotte did have coverage for the recipient portion of the donor cycle.

31.     Based on Blue Cross' approval, plaintiffs committed to CWRC's egg donor program and accepted one of its anonymous donors, receiving an itemized invoice detailing the medical procedures, CPT codes and corresponding fees concerning the donor program. The invoice totaled $28,975.00. Under the terms of the Agreement, Blue Cross was required, at a minimum, relative to out-of-network providers, to cover eighty percent (80%) of all costs for infertility treatment. Accordingly, plaintiffs were entitled to coverage of $23,180.00 for the egg donor procedure.

32.     Based on Blue Cross' approval, in December 2006, the anonymous donor underwent a battery of pre-screening tests and lab work and both Ms. Turcotte and the donor began taking prescribed fertility drugs.

33.     Following Ms. Turcotte's and CWRC's subsequent inquiry into whether the defendant provided coverage for any share of the *donor's* portion of the egg donor program, on December 20, 2006, the defendant rescinded its earlier approval of the recipient portion of the donor cycle, denied all coverage for the egg donor program and further denied coverage to plaintiffs for "all fertility services".

34.     Defendant has failed to perform under the terms of the Agreement and pay benefits due to plaintiffs in violation of 29 U.S.C. §1132.

35.     As a result of defendant's actions, plaintiffs had to incur all costs of CWRC's egg donor cycle, totaling $28,975.00, and have therefore been damaged.

36.     As a consequence, plaintiffs seek an award of damages in an amount to be determined at trial, but believed to be no less than TWENTY THREE THOUSAND ONE

HUNDRED AND EIGHTY DOLLARS ($23,180.00), plus interest, resulting from defendant's breach of its obligations under the health plan.

### THIRD CAUSE OF ACTION

### (29 U.S.C. §§1104(a)(1)(A) & (B), 1132(a)(3) – Breach of Fiduciary Duty)

37. Plaintiffs restate and incorporate paragraphs 1 through 36 above as if fully set forth herein.

38. At all relevant times, Blue Cross was and continues to be a "fiduciary" within the meaning of 29 U.S.C. §1002(21).

39. As a fiduciary, Blue Cross owed a duty of loyalty and care to plaintiffs and other plan participants.

40. Blue Cross breached its fiduciary obligations to plaintiffs by failing to discharge its duties with the care, skill, prudence and diligence of a prudent person in a similar situation. Blue Cross' interpretation of its obligations owed to plaintiffs was driven by self-interest. Blue Cross acted solely for its own financial benefit, and not for the benefit of plaintiffs and other plan participants. By placing its concern for profitability over plaintiffs' well-being and its duties to plaintiffs, Blue Cross breached its fiduciary duties.

41. Blue Cross has reaped the value of plaintiffs' premium payments, while disregarding its fiduciary obligations to plaintiffs by failing to act in plaintiffs' interests. Consequently, Blue Cross has been unjustly enriched by plaintiffs' payments of premiums.

42. As a direct and proximate result of Blue Cross' breach of its obligations pursuant to 29 U.S.C. §§1104(a)(1)(A) and (B), plaintiffs seek (i) restitution of the premiums paid to Blue Cross pursuant to 29 U.S.C. §1132(a)(3), and (ii) an award of damages in an amount to be

determined at trial, but believed to be no less than TWENTY THREE THOUSAND ONE HUNDRED AND EIGHTY DOLLARS ($23,180.00), plus interest, for unpaid claims.

**FOURTH CAUSE OF ACTION**

**(29 U.S.C. §1140 – Discrimination/Retaliatory Denial of Benefits)**

43.     Plaintiffs restate and incorporate paragraphs 1 through 42 above as if fully set forth herein.

44.     Plaintiffs and defendant entered into an agreement, whereby Blue Cross agreed to provide coverage for infertility services, including but not limited to egg and/or inseminated egg procurement and processing and in vitro fertilization, pursuant to the terms and conditions of the Agreement.

45.     In or about October 2006, plaintiffs' health care provider, CWRC, sought verification of coverage for Ms. Turcotte from the defendant for its egg donor program.

46.     On or about November 1, 2006, CWRC staff was advised by Blue Cross of Massachusetts that Ms. Turcotte did have coverage for the *recipient* portion of the donor cycle.

47.     Following the defendants' approval of the recipient portion of the donor cycle and while Ms. Turcotte and the donor were undergoing testing and fertility treatments, Ms. Turcotte requested that CWRC inquire as to whether any share of the *donor* portion of the cycle was covered under Blue Cross' PPO program.  CWRC advised Ms. Turcotte that her medical records would have to be submitted to the defendant for consideration of coverage of the *donor* portion of the cycle.

48.     As a direct result of Ms. Turcotte's inquiry as to whether additional coverage was available for her donor cycle, in a facsimile dated December 20, 2006 transmitted to CWRC,

Blue Cross advised that "Susan Turcotte is denied *all infertility services* by our physician review team. . . ." (emphasis added)

49. On or about December 20, 2006, subsequent to CWRC submitting Ms. Turcotte's medical records to the defendant, CWRC was advised that Blue Cross was rescinding its original approval for the recipient portion of the cycle and, in fact, denying coverage for the *recipient and donor portion* of the procedure. CWRC staff advised Ms. Turcotte that it had never experienced such a turnabout from an insurance carrier relative to this fertility procedure.

50. In a letter addressed to Ms. Turcotte also dated December 20, 2006, the defendant cited as its basis for denying coverage plaintiff's "1.5 years of 'unexplained' infertility", that "donor egg is covered only for absent ovaries, premature ovarian failure . . . or for inadequate harvest that is not age related" and the fact that "[d]onor egg is not covered to overcome the effects of natural aging."

51. In response, by letter dated January 8, 2007, plaintiffs challenged Blue Cross' findings that Ms. Turcotte's infertility was "age related", submitting letters from Ms. Turcotte's treating physicians stating that she had conceived and miscarried a child in the spring of 2005, at approximately 40.5 years of age, and that, according to one of her treating physicians at CWRC, and contradictory to the defendants' bald conclusion, her infertility *was the result of* "premature poor ovarian response".

52. In reply, by letter dated January 23, 2007, Blue Cross advised plaintiffs that an unidentified, "non-Blue Cross Blue Shield" physician had reviewed Ms. Turcotte's medical records and, despite the findings of Ms. Turcotte's treating physicians, affirmed that her infertility was based on her "advanced maternal age", asserting, without any medical support, that "Poor Ovarian Response . . . and even Ovarian Failure are not considered premature after

- 11 -

age 40" and concluding that plaintiffs' donor egg cycle was not covered under the Blue Cross policy.

53. But for Ms. Turcotte's inquiry as to additional coverage for the donor portion of the cycle, Blue Cross would not have taken the retaliatory measure of reversing its coverage decision, thereby denying coverage for <u>all</u> costs associated with Ms. Turcotte's procedure, and further denying "all infertility services" for this insured going forward.

54. Blue Cross attempted, in bad faith, to disguise this transparent act of discrimination and retaliation by proffering the bald and sweeping presumption that a post-40-year-old woman could not suffer from premature poor ovarian response, in spite of Ms. Turcotte's treating physicians providing written conclusions to the contrary.

55. As a result of defendant's actions, plaintiffs had to incur all costs of CWRC's egg donor cycle, totaling $28,975.00, and have therefore been damaged in violation of 29 U.S.C. §1140.

56. As a consequence, plaintiffs seek an award of damages in an amount to be determined at trial, but believed to be no less than TWENTY THREE THOUSAND ONE HUNDRED AND EIGHTY DOLLARS ($23,180.00), plus interest, resulting from defendant's discriminatory and retaliatory actions and breach of its obligations under the health plan.

## FIFTH CAUSE OF ACTION

### (Promissory Estoppel)

57. Plaintiffs restate and incorporate paragraphs 1 through 56 above as if fully set forth herein.

58. On or about November 1, 2006, Blue Cross committed, in communications with CWRC's staff, to coverage of recipient portion of Ms. Turcotte's donor cycle.

- 12 -

59. In agreeing to proceed with CWRC's egg donor program, plaintiffs relied upon the defendant's representations that it would, at a minimum, provide coverage for the recipient portion of the donor cycle. Plaintiffs further had the reasonable expectation that Blue Cross would honor the terms of the Agreement by covering, at a minimum, eighty percent (80%) of the costs of all infertility services performed by CWRC.

60. At the time it entered the Agreement, and at the time it subsequently communicated to CWRC that Ms. Turcotte had coverage for the recipient portion of the donor cycle, Blue Cross knew, or should have known, that plaintiffs would rely on its coverage approval and the terms of the Agreement in committing to CWRC's donor program and that, by rescinding its approval, it had made a material misrepresentation to CWRC and to plaintiffs.

61. As a consequence, plaintiff seeks an award of damages in an amount to be determined at trial, but believed to be no less than TWENTY THREE THOUSAND ONE HUNDRED AND EIGHTY DOLLARS ($23,180.00), plus interest, resulting from plaintiffs' reliance upon defendant's misrepresentations.

## SIXTH CAUSE OF ACTION

### (29 U.S.C. §1132(g)(1) -- Attorneys' Fees)

62. Plaintiffs restate and incorporate paragraphs 1 through 61 above as if fully set forth herein.

63. Blue Cross acted knowingly and in bad faith.

64. Upon information and belief, Blue Cross has the ability to satisfy an award of attorneys' fees.

65. An award of attorneys' fees will likely deter Blue Cross and others from continuing these unlawful practices.

66. Plaintiffs' position is meritorious.

67. By reason of the foregoing, pursuant to 29 U.S.C. §1132(g)(1), plaintiffs are entitled to an award of reasonable attorneys' fees and costs in connection with this action.

## SEVENTH CAUSE OF ACTION

### (Punitive Damages)

68. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 67 above.

69. Defendant acted with wanton, reckless disregard in committing the wrongful acts described above and its actions constitute a threat to other plan participants and the public at large.

70. As a consequence, plaintiff seeks an award of punitive damages, in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

**WHEREFORE**, plaintiffs demand judgment as follows:

(a) a judgment declaring that plaintiffs are entitled to insurance coverage for infertility services under the terms and conditions of the Agreement;

(b) compensatory damages in an amount to be determined at trial, but believed to be no less than TWENTY THREE THOUSAND ONE HUNDRED AND EIGHTY DOLLARS ($23,180.00);

(c) restitution of plaintiffs' premium payments pursuant to 29 U.S.C. §1132(a)(3);

(d) costs and disbursements of this action and reasonable attorneys' fees in accordance with 29 U.S.C. §1132(g)(1);

(e) punitive damages in the amount of FIVE MILLION DOLLARS ($5,000,000.00);

(f) prejudgment interest; and

(g) such other relief the Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a jury trial is hereby demanded.

Dated:   New York, New York
        July 6, 2007

 

    /s/Christopher B. Turcotte
Christopher B. Turcotte, Esq. (CT 0867)
575 Madison Avenue, Suite 1006
New York, New York  10022
*Attorney for Plaintiffs*